**\*\*\* FOR PUBLICATION IN WEST'S HAWAI‘I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCAP-24-0000313
06-AUG-2026
09:24 AM
Dkt. 46 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

RAMONA RICAPOR-HALL,
Plaintiff-Appellee/Cross-Appellant,

vs.

PHILIP MORRIS USA INC.,
Defendant-Appellant/Cross-Appellee,

and

R.J. REYNOLDS TOBACCO COMPANY; LIGGETT GROUP LLC;
FOODLAND SUPER MARKET, LIMITED,
Defendants-Appellees/Cross-Appellees.

SCAP-24-0000313

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-24-0000313; CASE NO. 1CCV-21-0000334)

AUGUST 6, 2026

DEVENS, C.J., McKENNA, EDDINS, AND GINOZA, JJ., AND
CIRCUIT JUDGE KIMURA, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY EDDINS, J.

**I.**

Ramona Ricapor-Hall smoked for sixty-six years.

A jury found that Philip Morris helped keep her smoking through decades of fraud about the dangers of cigarettes. Those cigarettes, it concluded, caused her lung cancer. The jury awarded Ricapor-Hall $6 million in general damages and $8 million in punitive damages.

The circuit court cut the general damages nearly in half. Because the jury found Ricapor-Hall partly at fault for her injuries, the court reduced her recovery by her share of negligence. Even on her claim that Philip Morris conspired to defraud.

That was error. We hold that a plaintiff's negligence does not reduce damages for an intentional tort. Ricapor-Hall's cross-appeal on that issue succeeds.

Philip Morris challenges the verdict on four grounds: the recall of discharged alternate jurors, the court's inquiry into Juror 30's alleged bias, two refused jury instructions, and the availability of punitive damages.

Each fails.

Hawai'i Rules of Civil Procedure (HRCP) Rule 47(b) did not bar the circuit court from recalling alternates it had earlier discharged.

No further investigation of Juror 30 was required. Philip Morris never made the showing that would have compelled it. The court adequately investigated anyway.

The two proposed jury instructions were properly denied. Philip Morris' preexisting injury instruction was unnecessary once the court limited damages to Ricapor-Hall's lung cancer. And cigarettes are not an unavoidably unsafe product.

Also nothing bars punitive damages. Ricapor-Hall's claim was not covered by the tobacco industry's past settlement with the states. Nor precluded by any earlier lawsuit.

Longstanding precedent and sound policy foreclose using comparative negligence to shrink recovery against an intentional wrongdoer. We therefore vacate the portion of the final judgment reducing Ricapor-Hall's damages and remand for entry of an amended judgment for the full amount. In all other respects, we affirm.

## II.

### A.    The Master Settlement Agreement

In 1997, the State of Hawai'i sued Philip Morris and other major cigarette manufacturers. The State sued through its attorney general, in a sovereign capacity. The complaint invoked the State's "parens patriae responsibility to protect the health and safety of its citizens."

The suit sought three things. Recovery of public funds the State spent treating Hawai'i residents with smoking-related disease. Disclosure of the industry's internal records. And

punitive damages.  It did not seek relief for injuries suffered by individual smokers.

In 1998, the State's suit settled, along with parallel suits brought by the attorneys general of most other states. The settlement is known as the Master Settlement Agreement (MSA).  Among other things, the MSA restricted cigarette marketing, required the industry to make formerly confidential records public, and set up a system of annual payments to the states based on each manufacturer's market share.

One MSA provision matters to this appeal.  The MSA defined "Releasing Parties" to identify whose claims the settlement released.  That definition reaches persons acting in a "parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity," but only "to the extent" they seek "relief on behalf of or generally applicable to the general public," "as opposed solely to private or individual relief for separate and distinct injuries."  Private claims for individual injuries were not released.

**B.   Ramona Ricapor-Hall**

Ramona Ricapor-Hall started smoking in 1953.  She was twelve years old.  Cigarette packages would carry no warning labels for another thirteen years.

By 1953, the scientific evidence linking cigarettes to lung cancer was emerging into public view.  The major cigarette

manufacturers responded not by warning the public, but by reassuring it that the science was unsettled. They conspired to deceive the public about the safety of smoking. Publicly, they peddled doubt. Privately, their own records acknowledged the deadly hazards.

Ricapor-Hall kept smoking for sixty-six years. She relied on the manufacturers' assurances when she decided to keep smoking. She tried many times to quit. Her nicotine addiction defeated those efforts. She relapsed again and again.

In 2019, doctors diagnosed Ricapor-Hall with lung cancer. A second primary lung cancer followed. In 2021, she sued Philip Morris and other manufacturers and vendors for her lung cancer.

**C.   The Trial**

Before trial, Ricapor-Hall settled with every defendant except Philip Morris. Her remaining claims against Philip Morris went to a bifurcated jury trial: negligence, strict products liability, and two conspiracy claims, conspiracy to commit fraudulent concealment and conspiracy to commit fraudulent misrepresentation. Phase one addressed liability, compensatory damages, and whether punitive damages could be awarded. Phase two would fix the amount of any punitive damages.

### 1. The Comparative Negligence Ruling

Midway through trial, the circuit court asked the parties to brief a remedy question. How would damages be calculated if the jury found Ricapor-Hall comparatively negligent and also found Philip Morris liable for conspiracy, an intentional tort?

The parties agreed on two points. For Ricapor-Hall's negligence claim, Hawai'i Revised Statutes (HRS) § 663-31's (2016) modified comparative negligence framework would govern. For her strict products liability claim, pure comparative negligence would apply. See Hao v. Owens-Illinois, Inc., 69 Haw. 231, 738 P.2d 416 (1987).

The parties split on the conspiracy claims. Ricapor-Hall maintained that comparative negligence cannot reduce damages for an intentional tort, because "it is impossible to compare the fault of a plaintiff with the intentional conduct of a defendant." Philip Morris argued the opposite, asserting that "Hawai'i law allows for application of pure comparative fault principles to intentional tort claims."

The circuit court adopted Philip Morris' position. It instructed the jury that if it found for Ricapor-Hall on her "strict products liability or conspiracy claims," the court would "reduce the amount of damages" by Ricapor-Hall's percentage of negligence, "regardless of any percentage of responsibility" assigned to her. Ricapor-Hall objected.

6

##### 2. The Disputed Jury Instructions

Four other jury instruction rulings matter to the issues on appeal.

The court declined to give an instruction on apportioning damages among preexisting injuries. Both parties had proposed versions. The court declined them because no expert had offered an apportionment opinion, and "[a] jury cannot rely upon pure conjecture and speculation on a question of medical apportionment."

The court did instruct, at Philip Morris' request, that Ricapor-Hall's claims were limited to her lung cancer. The jury was told that although it had heard evidence of Ricapor-Hall's "other diseases or conditions, including [COPD], peripheral vascular diseases, and heart disease," she was "only asserting claims" for "her own lung cancer and the related treatment," and there was "no claim" that Philip Morris caused "any other disease." The jury was further told it could award "only" damages "legally caused by" Philip Morris' cigarettes, negligence, or fraud, and not "speculative damages."

The court declined Philip Morris' proposed instruction on unavoidably unsafe products. That instruction, drawn from comment k of the Restatement (Second) of Torts § 402A (1965), would have told the jury that "[u]nless the product unreasonably

7

exposes users to risk of injury, there is no liability for supplying an unavoidably unsafe product."

The court gave the parties' agreed instruction on the scope of punitive damages. The jury was told it could "not seek to punish [Philip Morris] for any conduct except that conduct of [Philip Morris] that [Ricapor-Hall] has shown to have caused her injuries," and that it could "not impose punitive damages on [Philip Morris] in order to punish it for[] harms suffered by other people."

### 3.  The Alternate Jurors

The jury retired to deliberate on phase one on August 11, 2023. Three alternate jurors remained.

The circuit court did not permanently release the alternates. It told them their "service may not be done," that it was "done for today," and that the court would contact them "if we need your service in the future." It directed the alternates to keep following the instruction not to discuss the case, told them they remained "under the court's supervision for jury service," and promised day-to-day updates on their status.

Philip Morris objected. It argued that HRCP Rule 47(b) required the court to permanently discharge the alternates once deliberations began, and that the alternates would therefore be unavailable if a juror were later lost. The court overruled the objection. Because the trial was bifurcated and phase two would

8

proceed before the same jury, the court reasoned, the alternates would "remain subject to call." Replacing them with new alternates for phase two, the court explained, "would be disruptive and prejudicial to the parties."

### 4. Juror 30

On the morning of August 17, 2023, the fourth full day of phase one deliberations, Juror 30 told the court, through the bailiff, that she "may feel" she "cannot be a fair and impartial juror." The court suspended deliberations and recessed the jury.

Philip Morris moved for a mistrial. It argued that the jury was now short a member, that HRCP Rule 47(b) barred substituting an alternate, and that the court's questioning of Juror 30 had to be confined to confirming what she told the bailiff. Any further inquiry, Philip Morris said, would "trespass into the area of the thought processes of a sitting juror." The court denied the motion without prejudice, finding it had too little information to rule.

The court brought Juror 30 into the courtroom alone. She explained that she had encountered "some of the details" of the MSA while researching disaster-relief funds, and that the information had "colored" her view of "this whole case."

What Juror 30 said about the other jurors was equivocal. She said she "tried not to tell them anything about it," but

that they "kind of got wind of the MSA" when she explained her vote. She also said she "held that information back," that the others "don't know," and that she did not know whether anything "slipped out" during her explanation. Asked directly whether she recalled saying anything about the MSA during deliberations, she answered, "No."

The court offered both sides the chance to question Juror 30. Neither did. With the agreement of counsel, the court excused her.

### 5. The Investigation and the Substitutions

With Juror 30 excused, Ricapor-Hall asked the court to proceed with eleven jurors. Philip Morris again moved for a mistrial, arguing the jury was tainted and that HRCP Rule 47(b) forbade substituting an alternate.

The court decided to question each remaining juror, individually, about whether Juror 30 had exposed them to outside information. It recessed and asked both parties to propose questions. Ricapor-Hall proposed a sequence: first ask whether the juror received outside information, and only if so, ask how it influenced them. Philip Morris proposed nothing. It said juror questioning was "a fruitless act" and that it had not had the chance to brief the issue.

The court made three rulings. It denied the renewed mistrial motion. It ruled that substituting an alternate was

proper, because in a bifurcated trial "all deliberations have not yet begun" until phase two deliberations begin.  And it decided to call each juror in alone and ask a single question.

The court worked through several drafts of that question with counsel.  As it did, Philip Morris objected that the question would not capture "what information [the jury] received."  The court again asked Philip Morris what question it would pose.  Philip Morris again declined to say.  The court explained its concern: pressing jurors for the specifics of the extraneous information could "attract[] more attention than less" and invite the very mistrial Philip Morris sought.

The court then questioned the eleven remaining jurors one at a time.  Each was questioned "in the presence of" that person alone "and the absence of all other jurors."  The court asked the same questions of each: whether, if the juror "heard any comments or statements made by [Juror 30] during the jury's deliberations about information that was not evidence in this case," the juror could "still be a fair and impartial juror in this case."

One juror first answered "No."  But it was unclear which question he was answering.  Had he heard nothing?  Or could he no longer be impartial?

The court did not let the uncertainty stand.  It brought the juror back and asked him directly whether he had heard Juror

11

30 "say anything about something that was not evidence in the case." He answered: "No, Your Honor. I never heard anything from them." Asked then whether he could be fair and impartial, he said he could. Every one of the eleven jurors confirmed that they could remain fair and impartial. Philip Morris asked no follow-up questions.

The court seated the first alternate in Juror 30's place. It instructed the reconstituted jury to "begin your deliberations all over," to "express your positions and then revote on everything," and to proceed "as if we were just starting now."

A second substitution followed. On August 22, 2023, the court excused Juror 33 to accommodate travel plans the juror had disclosed during jury selection, reasoning that keeping the juror would delay deliberations by three days. Philip Morris renewed its mistrial motion. The court denied it.

The court seated the second alternate. It instructed the jury to "begin jury deliberations all over again," to consider the evidence and law "as if previous deliberations have not occurred," to select a new foreperson, and to vote anew on a new verdict form. The court asked any juror who could not follow those instructions to raise a hand. None did.

The reconstituted jury then deliberated for over eight hours before reaching its phase one verdict. At no point did

the jury report a deadlock.

### 6.    The Verdicts and the Judgment

The phase one verdict went against Philip Morris on every claim.  The jury found for Ricapor-Hall on strict products liability, negligence, and both conspiracy counts.  It found Philip Morris' cigarettes defectively designed and its conduct negligent.  And it concluded that Philip Morris conspired to conceal and misrepresent cigarettes' harms — a deception Ricapor-Hall reasonably believed.

The jury awarded Ricapor-Hall $6 million in general damages.  It assigned fault to both sides.  Fifty-four percent to Philip Morris.  Forty-six percent to Ricapor-Hall.  And it found that Philip Morris' conduct was intentional, willful, wanton, oppressive, or grossly negligent, exposing Philip Morris to punitive damages.

Phase two turned to the amount.  Both parties reminded the jury that punitive damages could only punish Philip Morris for the harm it caused Ricapor-Hall, not for harm to anyone else.

The jury awarded $8 million in punitive damages.

On October 10, 2023, the circuit court entered final judgment.  Applying its comparative negligence ruling, the court reduced Ricapor-Hall's $6,000,000 in general damages by her forty-six percent share of fault, to $3,240,000, citing HRS § 663-31, Hao, and Ozaki v. Ass'n of Apartment Owners of

13

Discovery Bay, 87 Hawai'i 265, 954 P.2d 644 (1998).  After crediting Philip Morris for prior settlement with the co-defendants, the final judgment totaled $11,095,000.

**D.    The Appeals**

Philip Morris appealed.  It raised four claims of error.  First, that HRCP Rule 47(b) barred recalling discharged alternates and substituting them mid-deliberation.  Second, that the court failed to adequately investigate whether Juror 30 exposed the jury to outside information.  Third, that the court should have instructed the jury on apportioning preexisting injuries and on unavoidably unsafe products.  And fourth, that the MSA precluded any award of punitive damages.

Ricapor-Hall cross-appealed.  She argued that the circuit court was wrong to reduce her damages on the conspiracy claims, because a plaintiff's negligence does not reduce damages for an intentional tort.

We accepted transfer of the case from the Intermediate Court of Appeals.

III.

**A.    The Circuit Court's Juror Substitutions Do Not Warrant a New Trial**

Philip Morris raises two challenges to the jury that decided phase one.  It says the circuit court violated HRCP Rule 47(b) by recalling discharged alternates and substituting them

14

in during deliberations.  And it says the court failed to adequately investigate whether Juror 30 exposed the jury to outside information.

Neither challenge warrants a new trial.

### 1.   HRCP Rule 47(b) Does Not Bar Recalling Discharged Alternates

HRCP Rule 47(b) provides that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."  Philip Morris reads this to mean that alternate jurors "must be discharged after deliberations begin, and may not replace a regular juror after that time."

The rule does not say that.

HRCP Rule 47(b) makes discharge mandatory.  See Malahoff v. Saito, 111 Hawai'i 168, 191, 140 P.3d 401, 424 (2006) ("shall" is "construed as mandatory").  But the rule does not define "discharge."  And nothing in its text compels the conclusion that discharge must be permanent.

We construe the Hawai'i Rules of Civil Procedure under the same principles that govern statutory interpretation.  Gap v. Puna Geothermal Venture, 106 Hawai'i 325, 331, 104 P.3d 912, 918 (2004).  We give the rule's words their ordinary meaning, and when a term is undefined, we may consult dictionaries to

15

determine that meaning.  Rodriguez v. Mauna Kea Resort LLC, 156 Hawai'i 289, 293, 574 P.3d 309, 313 (2025).

Black's Law Dictionary defines "discharge of juror" as "[t]he relieving of a . . . juror, . . . from further responsibilities in a case." *Discharge*, Black's Law Dictionary 581 (12th ed. 2024).  The New Oxford American Dictionary defines "discharge" as to "tell (someone) officially that they can or must leave." *Discharge*, New Oxford American Dictionary 485 (2001).

Neither definition compels permanence.  Black's speaks of relief from responsibilities in a case.  But here the alternates were told the case was not over for them, that their "service may not be done," and that they remained "under the court's supervision for jury service."  New Oxford is broader still. Telling a juror they "can" leave is not telling them they must never return.  Nothing in either forecloses recall.

In the context of alternate jurors, "discharge" means temporarily relieving alternates of their responsibilities for the time being.  Alternates serve provisionally by design.

Throughout trial, alternates sit next to the regular jurors as the evidence comes in.  See HRCP Rule 47(b).  When the twelve jurors retire to deliberate, the alternates do not go with them. Their responsibilities pause.  The court "discharges" them.  It tells them they may leave.

16

But "discharge" does not mean "permanently sever." A discharged alternate may be called back. HRCP Rule 47(b) doesn't forbid it.

Other courts have read identical language the same way. Before Federal Rule of Criminal Procedure 24(c) was amended in 1999 to expressly authorize mid-deliberation substitutions, the Fourth Circuit construed the unamended rule to permit them. The rule then provided, as HRCP Rule 47(b) provides now, that an alternate "shall be discharged after the jury retires to consider its verdict." United States v. Evans, 635 F.2d 1124, 1127 (4th Cir. 1980). The rule, the court explained, "does not purport[] . . . to deny power to the trial court to reconstitute someone as a juror who previously has been discharged." Id.; see also Cork v. State, 433 So.2d 959, 963 (Ala. Crim. App. 1983) (same).

Our rule tracks the federal rule Evans construed, word for word. It carries the same meaning. HRCP Rule 47(b) does not strip a trial court of the power to recall a discharged alternate.

The defendant in Evans favored the substitution. Philip Morris didn't. No matter. The Fourth Circuit's construction turned on the rule's text, not the parties' consent. The power to recall a discharged alternate belongs to the court, and it does not appear and disappear with the litigants' preferences.

17

Reading HRCP Rule 47(b) Philip Morris' way would frustrate the purpose the rules serve. The HRCP "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." HRCP Rule 1(a). A rule that forced a court to toss a month of trial whenever a juror became unavailable during deliberations, even with vetted alternates standing ready, would serve none of those ends. It would defeat all three.

The concern is not abstract. This trial lasted over a month. It consumed substantial judicial resources. And Ricapor-Hall is eighty-five years old, in declining health. A construction of HRCP Rule 47(b) that required this case to be tried twice is not one the text commands, and not one HRCP Rule 1(a) tolerates.

The Hawai'i Rules of Civil Procedure are liberally construed to promote justice. Struzik v. City & Cnty. of Honolulu, 50 Haw. 241, 246, 437 P.2d 880, 884 (1968).

The circuit court here proceeded with care. When the jury retired on phase one, the court excused the alternates only "for today," held them to the instruction not to discuss the case, and told them they might be recalled. When a juror was later lost, the court recalled an alternate and had the jury start its deliberations over. That's what careful use of HRCP Rule 47(b) looks like.

18

The circuit court did not violate HRCP Rule 47(b).

The parties also dispute when, in a bifurcated trial, the jury "retires to consider its verdict." Because our reading of "discharge" permits recall regardless, we do not decide it.

### 2. Any Violation of HRCP Rule 47(b) Was Harmless

Even if the substitutions skirted HRCP Rule 47(b), the violation would not warrant a new trial. Any error was harmless.

Faulty trial rulings are subject to harmless error review. See HRCP Rule 61; Bank of Hawaii v. Shinn, 120 Hawaiʻi 1, 12, 200 P.3d 370, 381 (2008). HRCP Rule 61 is written broadly and admits no exception. "[N]o error or defect in any ruling or order or in anything done or omitted by the court" is ground for a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice." HRCP Rule 61.

Philip Morris' contention that juror-substitution errors escape this rule rests on out-of-state authority. But our own rule and our own precedent control. HRCP Rule 61 allows no exception, and we applied harmless error analysis to the analogous criminal rule in State v. Wideman, 69 Haw. 268, 269, 739 P.2d 931, 932 (1987). The cases Philip Morris gathers from other jurisdictions give us no reason to read an exception into a rule that contains none.

Philip Morris itself acknowledges that "replacing a deliberating juror with an alternate is not per se harmful." Philip Morris points to one risk in particular. A juror substituted after deliberations have begun "is subject to potential undue pressure from the original jury members to reach a conclusion they may have agreed upon during their prior deliberations." Wideman, 69 Haw. at 269, 739 P.2d at 932.

That risk, though, is one a trial court can manage through its instructions. The circuit court did. After each substitution, it instructed the jury to begin deliberations anew. The instructions were specific. Select a new foreperson. Use a new verdict form. Weigh the evidence and the law "as if previous deliberations had not occurred." Re-state positions and revote on every question.

The court invited any juror who could not follow those directions to speak up. None did. The start-over instruction's absence troubled the court in Wideman. See 69 Haw. at 269, 739 P.2d at 932 (faulting "the lack of an instruction to the new jury to begin its deliberations anew"). Here it was given. And given in detail.

Juries are "presumed to be reasonable and follow all of the trial court's instructions." Myers v. South Seas Corp., 76 Hawai'i 161, 165, 871 P.2d 1231, 1235 (1994).

20

Philip Morris invokes the dissent from this court's denial of certiorari in State v. Baldado, No. SCWC-29623, 2011 WL 6144302 (Haw. Dec. 1, 2011). A dissent from a cert denial decides nothing and binds no one. Even on its own terms, it does not help Philip Morris. The dissent reasoned that the presumption was "reasonably called into question" where a jury deliberated for days, reported that it was deadlocked, and then returned a verdict less than six hours after an alternate was seated. Id. at *2 (Acoba, J., dissenting).

This case bears no resemblance to that one. This jury never deadlocked. And the reconstituted jury deliberated over eight hours before reaching its verdict, longer than the under-six-hour verdict that troubled the Baldado dissenters.

Nothing in this record rebuts the presumption that the jury followed the circuit court's instructions. Any violation of HRCP Rule 47(b) was harmless. The substitutions do not warrant a new trial.

**B.   The Circuit Court's Investigation of Juror 30 Does Not Warrant a New Trial**

During phase one deliberations, Juror 30 told the court she had come across outside information about a settlement between tobacco companies and the states.

The circuit court questioned her, excused her, and then questioned each remaining juror individually, outside the

21

presence of the other jurors.  Philip Morris maintains that this investigation was inadequate.

The argument fails at the threshold.  Philip Morris never made the showing that would have triggered a duty to investigate at all.  And even if it had, the investigation was sufficient and any misconduct was harmless.

### 1.  Philip Morris Did Not Make a Prima Facie Showing

"[T]rial courts have wide latitude to assess the nature of alleged juror misconduct and its prejudicial impact on a defendant's right to a fair trial."  State v. Grewer, 157 Hawai'i 104, 111, 575 P.3d 737, 744 (2025).

When a party claims it was denied a fair trial by an impartial jury, the trial court first determines "whether the nature of the alleged deprivation rises to the level of being substantially prejudicial."  State v. Chin, 135 Hawai'i 437, 445, 353 P.3d 979, 987 (2015).  "If it does not rise to such a level, the trial court is under no duty to interrogate the jury."  Id.

The burden rests on the complaining party.  It must make "a prima facie showing of a deprivation that could substantially prejudice [its] right to a fair trial by an impartial jury."  Id. at 443, 353 P.3d at 985.  That requires "'some specific, substantial evidence' showing the occurrence of the outside influence that may have possibly biased the juror."  Id. at 443 n.10, 353 P.3d at 985 n.10.

22

When the alleged deprivation rests on statements made during deliberations, the showing is more demanding still. See State v. Gabalis, 83 Hawai'i 40, 47, 924 P.2d 534, 541 (1996); see also State v. Kim, 103 Hawai'i 285, 292, 81 P.3d 1200, 1207 (2003).

Our cases setting out this framework arose in criminal appeals. Neither party identifies a Hawai'i civil decision applying a different rule, and both litigate this appeal under the same standard. We hold that the Chin framework applies in civil cases as well. The right to a fair trial before an impartial jury is not the criminal law's alone.

Philip Morris does not carry its burden. It falls short for two reasons.

First, the record contains no specific, substantial evidence that an outside influence reached the other jurors.

At the prima facie stage, Philip Morris need not prove prejudice. But it must show "the occurrence" of an outside influence that "may have possibly" prejudiced the jury, and it must do so with "specific, substantial evidence." Chin, 135 Hawai'i at 443 n.10, 353 P.3d at 985 n.10. Evidence that is "pure conjecture," or merely "equivocal," isn't good enough. State v. Amorin, 58 Haw. 623, 631, 574 P.2d 895, 900 (1978); State v. Okumura, 78 Hawai'i 383, 396, 894 P.2d 80, 93 (1995).

23

Juror 30's account was equivocal.  See supra II.C.4.  She said she "held that information back," that the others "don't know," and that she "tried not to tell [the jurors] anything about it."  But she also said the jurors "kind of got wind of the MSA" when she explained her vote and that she did not know whether anything "slipped out."  Asked directly whether she recalled saying anything about the MSA during deliberations, she answered, "No."

Equivocation doesn't meet that standard.  Juror 30 herself did not know whether she had conveyed anything to anyone.  To infer that she did, and that what she conveyed could have biased the jury, would be conjecture.  See State v. Blanding, 69 Haw. 583, 587, 752 P.2d 99, 101 (1988) (rejecting a prejudice claim where it was "unclear what statements were overheard").

Philip Morris now says the record is too thin to tell what happened.  But Philip Morris made it that way.

Before the court questioned Juror 30, Philip Morris insisted that the court could "only . . . confirm what she said to [the] bailiff" and could go no further.  After the court questioned Juror 30, it offered Philip Morris the chance to question her.  Philip Morris passed.

After the court excused Juror 30, it asked both parties to propose questions for the remaining jurors.  Philip Morris proposed none.  When the court revised its proposed question and

24

again asked for input, Philip Morris offered none.  And when the court questioned the remaining jurors one by one, it afforded Philip Morris the opportunity to question each in turn.  Philip Morris declined every time.

Four opportunities.  Four refusals.

Philip Morris' only explanation was that it did not have time to review the caselaw.  Instead of helping develop a record, it pressed for a mistrial.  But a litigant cannot refuse to take part in the court's inquiry, plead lack of time to prepare, and then assign error to the gaps that refusal left behind.  See Leyson v. Steuermann, 5 Haw. App. 504, 520, 705 P.2d 37, 48 (App. 1985).

Whether Juror 30 herself was influenced does not matter.  The court excused her.  What matters is whether a potentially biasing influence reached the jurors who decided the case.  On that question, the record is silent.

Second, even assuming an outside influence reached the jury, Philip Morris has not shown that it was used as a circumstance against it.

Because Philip Morris alleges a deprivation based on statements made during deliberations, it must show "that improper juror comments during deliberations have been used as a circumstance against" it.  Gabalis, 83 Hawai'i at 47, 924 P.2d at 541.  Absent that showing, the alleged deprivation does not

25

"rise to the level of being substantially prejudicial." Id. at 46, 924 P.2d at 540.

Philip Morris makes no such showing. The record does not reveal what Juror 30 said, how it shaped her own view, how she voted when she said it, or whether her remarks cut for Philip Morris or against it. The record is blank on each point.

That uncertainty sinks the claim, because information about the settlement agreement could favor either side. A juror might take the agreement as proof of Philip Morris' wrongdoing. Or a juror might take it the other way, as a sign that Philip Morris had already paid billions under the settlement and therefore the company had been punished enough. That inference would favor Philip Morris, not Ricapor-Hall.

Rather than show how Juror 30's remarks were used against it, Philip Morris simply assumes they were. But see Kim, 103 Hawai'i at 292, 81 P.3d at 1207 (requiring the complaining party to "show how" a juror's statements were "used as a circumstance against" them). An assumption is not a prima facie showing. To presume that unidentified remarks, of unknown content, biased the jury against Philip Morris would be to rest a new trial on a hunch.

Philip Morris' allegations do not raise a rebuttable presumption of prejudice. See Gabalis, 83 Hawai'i at 46, 924

26

P.2d at 540.  The circuit court therefore had no duty to investigate at all.

2.  **The Circuit Court's Decision to Investigate Does Not Mean Philip Morris Met its Burden**

Philip Morris argues that because the circuit court chose to question the jurors, the court must have found a prima facie showing.

A trial court may question jurors "as a precautionary measure," even without finding substantial prejudice.  State v. Keohokapu, 127 Hawai'i 91, 102 n.18, 276 P.3d 660, 671 n.18 (2012).  "Absent a ruling from the court on the question of prejudice, it would seem incorrect . . . to infer that the court implicitly determined that there was substantial prejudice." Id.

The circuit court's decision to question the remaining jurors reflects caution, not a finding that Philip Morris had carried a burden it never tried to carry.

3.  **Even if Philip Morris Made a Prima Facie Showing, a New Trial Is Not Warranted**

Were we to assume a prima facie showing, the result would not change.  The circuit court's investigation was sufficient, and any misconduct was harmless.

a.  **The Investigation Was Adequate**

Once a rebuttable presumption of prejudice arises, "the trial judge is . . . duty bound to further investigate the

27

totality of the circumstances surrounding the outside influence to determine its impact on jury impartiality." Chin, 135 Hawai'i at 448, 353 P.3d at 990 (cleaned up). That duty includes "individual examination of potentially tainted jurors, outside the presence of the other jurors, to determine the influence, if any, of the extraneous matters." Id.

The circuit court did exactly that. It examined each remaining juror one at a time. The record reflects that each juror was questioned alone, in "the absence of all other jurors." The court did not question the jurors as a group. It questioned them in isolation, the very method Chin prescribes. And it crafted its question only after extended discussion and several revisions, with input from Ricapor-Hall and no proposed question from Philip Morris.

The court asked each juror the same question. The question covered any statement Juror 30 made "at any time while the jury was deliberating." It asked whether a juror who "heard any comments or statements made by [Juror 30] during the jury's deliberations about information that was not evidence in this case" could "still be a fair and impartial juror in this case." All eleven jurors answered that they could remain fair and impartial.

Philip Morris had no follow-up for them.

28

The circuit court was right to phrase its inquiry with care. Juror 30's own account had not established what specific information she encountered, much less whether she shared any of it. Pressing the remaining jurors for the details of the settlement agreement risked teaching them the very information the court was trying to keep out, and risked, as the court put it, "attract[ing] more attention than less." The court chose a question that tested impartiality without contaminating the jury.

Philip Morris contends the court should have proceeded in stages, asking first what each juror heard, next what was said, and only last whether the juror could remain impartial. The court followed that sequence when a juror's answer called for it. See supra II.C.5. When one juror first answered with an ambiguous "No," the court brought him back, asked directly whether he had heard Juror 30 "say anything about something that was not evidence in the case," and got a clear answer: "No, Your Honor. I never heard anything from them." Only then did the court turn to impartiality. The court used the steps Philip Morris says it skipped.

Could the circuit court have asked more of every juror? Perhaps. But the availability of a more searching approach does not make the approach taken deficient. The court's question was sufficient to "determine" the influence, if any, on the jury's

29

impartiality. Chin, 135 Hawai'i at 448, 353 P.3d at 990. Before a verdict is returned, a trial court may "rely on the jurors[']" own assessment of "whether they could remain impartial." State v. Gouveia, 139 Hawai'i 70, 80, 384 P.3d 846, 856 (2016).

The circuit court acted well within its "wide latitude" to assess alleged misconduct and its effect on the right to a fair trial. Grewer, 157 Hawai'i at 111, 575 P.3d at 744.

Philip Morris' authorities do not require more. It relies on State v. Pokini for the proposition that a court must examine "objective as well as subjective indicia" of impartiality. 55 Haw. 640, 643, 526 P.2d 94, 100 (1974). But Pokini imposed that requirement in a specific setting: "[w]here pre-trial publicity is as extensive and as likely prejudicial as it was here." Id. The defendants there made a substantial factual showing of adverse pre-trial publicity, including extensive coverage of a prior trial and conviction. Id. at 642, 526 P.2d at 99. Against that backdrop, "perfunctory and generalized questions" were not enough. Id. at 643, 526 P.2d at 100.

This case is not Pokini. Any outside influence here, if it occurred at all, was limited in scope and unknown in content. It is nothing like the extensive, demonstrably adverse publicity that drove Pokini.

Philip Morris also relies on Gov't of the Virgin Islands v. Dowling, where the Third Circuit faulted a trial court for

30

jumping "to the ultimate issue" of impartiality without first determining what information the jurors had received. 814 F.2d 134, 140 (3d Cir. 1987). But in Dowling the content of the communication was known. A juror had told the others about the defendant's prior bank robbery conviction. Id. at 135-36. The error there was bypassing facts already in the record. Here, the content of any communication is not in the record, because Juror 30 herself did not know what, if anything, she had conveyed.

The circuit court investigated what could be investigated. That was enough.

### b. Any Misconduct Was Harmless

Even where a rebuttable presumption of prejudice arises, the verdict stands if "it is clearly shown that the juror's conduct could not have affected the verdict." Lopez v. Sears Roebuck & Co., 70 Haw. 562, 564, 777 P.2d 715, 717 (1989).

That standard is met here. Whatever Juror 30 might have communicated about the settlement agreement, the jury already knew the substance of it.

The jury heard about the attorneys general lawsuits and the settlement that followed. A trial witness testified that formerly secret tobacco industry documents "were released through litigation as a part of certain settlements," principally a settlement involving "the attorney generals of the

states that sued the tobacco industry." Ricapor-Hall's counsel described the same lawsuits and disclosures in opening. That the settlement existed, and that it compelled the release of internal documents, was not new information.

The jury also heard about the post-1998 restrictions on tobacco marketing. Philip Morris itself elicited that testimony, cross-examining Ricapor-Hall's expert about the government's "post-1998 regulation" of how tobacco companies operate and establishing that certain advertising was "no longer allowed" as of 1998.

And the jury was well aware of Philip Morris' wealth. It heard that Philip Morris is the nation's leading cigarette manufacturer and had spent "billions of dollars" merely to study the "psychology of women" for marketing purposes. Any inference about the company's resources that the settlement agreement might have suggested was an inference the jury could already draw.

Philip Morris isolates two facts it says the jury never learned: the specific dollar figures it paid under the settlement, and that the marketing restrictions were imposed by that settlement in particular. But the jury knew Philip Morris had been sued, knew the suit had settled, knew internal documents had been disclosed, knew marketing was restricted, and knew the company operated on an international scale. Attaching

the label "MSA" to facts already in evidence does not convert them into something prejudicial. Whatever Juror 30 may have said could not have told the jury anything that mattered which it did not already know.

Philip Morris did not make its prima facie showing. Even if it had, the circuit court's investigation was sufficient and any misconduct was harmless. The circumstances surrounding Juror 30 do not warrant a new trial.

## C.   The Preexisting Conditions Instruction Was Redundant

Philip Morris asked the circuit court to instruct the jury on how to apportion damages among Ricapor-Hall's diagnoses. The court declined.

That was not error.

A trial court must give a proposed instruction when it (1) "accurately states the law," (2) "is applicable to an issue presented," and (3) "is not needlessly duplicative." Medeiros v. Choy, 142 Hawai'i 233, 240, 418 P.3d 574, 581 (2018). Philip Morris' instruction cleared the first. Not the second or third.

The circuit court's other instructions already limited the jury's award to Ricapor-Hall's lung cancer. The jury was told that Ricapor-Hall "is only asserting claims" for her "lung cancer and the related treatment." It heard that although evidence of her "other diseases or conditions, including [COPD], peripheral vascular diseases, and heart disease" had come in,

33

there was "no claim" that Philip Morris caused "any other disease." It was told it could award "only" damages "legally caused by" Philip Morris' cigarettes, negligence, or fraud, and not "speculative damages."

These instructions took every disease but lung cancer off the table. The jury could not award damages for COPD. Or heart disease. Or peripheral vascular disease. There was nothing to split.

We presume the jury acted reasonably and followed the court's instructions. Myers, 76 Hawai'i at 165, 871 P.2d at 1235. Nothing suggests the jury strayed. Presuming otherwise, as Philip Morris asks, is "impermissible." Kato v. Funari, 118 Hawai'i 375, 383-84, 191 P.3d 1052, 1060-61 (2008) (rejecting presumption that jury awarded damages for "pre-existing conditions and post-accident injuries" when instructed to limit damages to those "legally caused by [defendant's] negligence").

Philip Morris says Hawai'i law puts the apportionment burden on the plaintiff. See Loui v. Oakley, 50 Haw. 260, 264 n.3, 438 P.2d 393, 397 n.3 (1968).

True. But apportionment presupposes injuries to divide. Here there was one injury. Ricapor-Hall limited her claim to lung cancer. The instructions kept the jury there.

The record confirms the point. Preexisting injuries are "a question of fact for which medical testimony is especially

appropriate." Montalvo v. Lapez, 77 Hawai'i 282, 299, 884 P.2d 345, 362 (1994). Philip Morris presented no expert who assigned any part of her lung cancer to another cause. When the chance came, Philip Morris passed. A litigant cannot manufacture error from a foundation it chose not to build.

Philip Morris also points to Ricapor-Hall's closing, where counsel told the jury it would "have to . . . put a monetary amount to a pair of healthy lungs." It did not object. And read in context, counsel was inviting the jury to value what her lung cancer took, not her other conditions.

No jury instruction error. No new trial.

## D. Cigarettes Are Not an Unavoidably Unsafe Product

Philip Morris asked for a jury instruction drawn from comment k of the Restatement (Second) of Torts § 402A. The court declined.

The court got it right.

Comment k exempts sellers of products "which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." Restatement (Second) of Torts § 402A cmt. k, at 353.

Take Pasteur's rabies vaccine. The Restatement's leading example. Rabies "invariably leads to a dreadful death." Id. The vaccine itself carries an "unavoidable high degree of risk." Id. But because rabies is fatal without it, the vaccine's use

35

is "fully justified." Id. The comment extends to "many other drugs, vaccines, and the like." Id. at 354.

Comment k trades known risk for meaningful benefit. The kind of benefit that saves lives or averts serious disease.

Cigarettes flip the equation. They cause disease. They do not cure it.

This court has rejected comment k for a product with real medical value. Cigarettes have none. In Larsen, the manufacturer of a recalled pacemaker sought comment k cover. Larsen v. Pacesetter Sys., Inc., 74 Haw. 1, 22, 837 P.2d 1273, 1285 (1992). This court refused. The pacemaker was not "sufficiently analogous to a new and experimental drug to warrant comment k exemption." Id. at 24-25, 837 P.2d at 1286.

The analogy doesn't stretch to cigarettes. They treat nothing. They prevent nothing. If a pacemaker cannot invoke comment k, cigarettes have no chance. A pacemaker saves lives. A cigarette ends them.

Philip Morris hangs its argument on Ricapor-Hall's testimony that she "enjoyed smoking." Pleasure is not the benefit comment k contemplates. Comment k concerns products whose benefits are substantial enough to justify their known risks. The rabies vaccine. Prescription drugs. Medical devices. See Restatement (Second) of Torts § 402A cmt. k; Pollard v. Ashby, 793 S.W.2d 394, 399 (Mo. Ct. App. 1990)

(collecting drug cases); Tansy v. Dacomed Corp., 890 P.2d 881, 885 (Okla. 1994) (collecting device cases).

No court has extended comment k to cigarettes. See Guilbeault v. R.J. Reynolds Tobacco Co., 84 F. Supp. 2d 263, 279 n.6 (D.R.I. 2000) (comment k "not relevant" to a cigarette manufacturer).

Cigarettes fall outside comment k. The proposed instruction had no basis.

The instruction was defective for another reason. Comment k immunity is an affirmative defense. See Burningham v. Wright Med. Tech., Inc., 448 P.3d 1283, 1291 (Utah 2019); Tansy, 890 P.2d at 886. Philip Morris had the burden. Its instruction never told the jury that.

No error. Comment k protects vaccines. Not cigarettes.

**E.   Ricapor-Hall's Punitive Damages Claim Survives**

Philip Morris' final challenge concerns punitive damages. It contends the MSA between the tobacco industry and the states barred Ricapor-Hall's claim. And that if the MSA didn't, claim preclusion did.

Both arguments fail.

**1.   The MSA Preserves the Claim**

Settlement agreements are contracts. Exotics Hawaii-Kona, Inc. v. E.I. du Pont de Nemours & Co., 116 Hawai'i 277, 288, 172 P.3d 1021, 1032 (2007). When parties settle a case, their

37

agreement defines its preclusive reach.  See Hite v. Queen's Hosp., 36 Haw. 250, 308 (Haw. Terr. 1942); Wong v. Cayetano, 111 Hawai'i 462, 481, 143 P.3d 1, 20 (2006).

The MSA's text answers the question.

The MSA releases claims by "Releasing Parties."  The term covers anyone in a "private attorney general" or "any other capacity."  But only when they seek "relief on behalf of or generally applicable to the general public," "as opposed solely to private or individual relief for separate and distinct injuries."

That draws the line.

Ricapor-Hall was not a Releasing Party.  She did not sue on behalf of the general public.  She sought damages for her own lung cancer.  And she sought punitive damages tied to Philip Morris' conduct toward her, not anyone else.

Everyone at trial said so.  The circuit court instructed the jury that it could "not impose punitive damages on [Philip Morris] in order to punish it for[] harms suffered by other people," and that it could punish Philip Morris only for conduct "shown to have caused [Ricapor-Hall's] injuries."  Ricapor-Hall's counsel told the jury, "It's about her.  It's about her."  Philip Morris' counsel took the same position: "this is not a referendum on smoking. . . .  [I]t has to be tied to Mrs.

38

Ricapor-Hall." And again at closing, counsel argued "general harms" were "not the purpose of awarding punitive damages here."

Philip Morris said it at trial. It is bound by it now.

Other courts have read the MSA the same way. In Laramie, the Massachusetts Supreme Judicial Court held that the MSA "released Philip Morris from liability for punitive damages to persons . . . seeking relief on behalf of the general public" but "preserved claims for individual relief for separate and distinct injuries." Laramie v. Philip Morris USA, Inc., 173 N.E.3d 731, 740 (Mass. 2021). So did Williams. See Williams v. R.J. Reynolds Tobacco Co., 271 P.3d 103, 113 (Or. 2011).

The MSA does not bar Ricapor-Hall's punitive damages.

### 2. Claim Preclusion Misses Two Elements

Claim preclusion requires (1) "a final judgment on the merits," (2) "both parties are the same or are in privity," and (3) "the claim decided in the original suit is identical with the one presented in the action in question." Priceline.com, Inc. v. Dir. of Tax'n, 144 Hawaiʻi 72, 82, 436 P.3d 1155, 1165 (2019).

Here, two of the three elements are missing.

### a. The Claims Are Not Identical

Ricapor-Hall's claims could not have been litigated in the 1997 Attorney General suit. They had not yet accrued. Doctors detected her lung cancer in 2019, twenty-two years later.

39

Claim preclusion is "inapplicable in a later suit where the cause of action did not accrue until after the complaint in a prior action was filed." Wong, 111 Hawai'i at 478, 143 P.3d at 17. The rule does not reach claims that did not yet exist.

Philip Morris says the two lawsuits are identical because both punished it for the same fraudulent conduct. This misses the point.

The Attorney General sued to recover the State's economic burden. Medicaid costs, public healthcare spending, and other public losses. Ricapor-Hall sued for the harm to her lungs. As Philip Morris told the jury, "general harms" were "not the purpose of awarding punitive damages here." Same defendant. Different wrongs.

Other courts see two suits, not one. See Laramie, 173 N.E.3d at 746 (plaintiff's wrong was "the loss she and her daughter sustained"; the Attorney General's was "the Commonwealth's increased medical expenditures"); Williams, 271 P.3d at 112 n.11; In re Exxon Valdez, 270 F.3d 1215, 1227-28 (9th Cir. 2001) (public and private punitive damages claims are "distinct"); Engle v. Liggett Grp., Inc., 945 So.2d 1246, 1260-61 (Fla. 2006).

### b.    The Parties Are Not in Privity

The Attorney General did not represent Ricapor-Hall's interest. It sued for the State's own economic injuries, not

40

for the personal injuries of smokers. Ricapor-Hall sued for her injuries. Those interests diverge.

Philip Morris' contrary argument rests on the premise that punitive damages in Hawai'i serve an "exclusively public" purpose. They do not.

This court recently observed that "punitive damages increasingly remedy social rather than purely individual harms." Guieb v. Guieb, 156 Hawai'i 162, 172, 571 P.3d 382, 392 (2025) (emphasis added). "Increasingly" is doing work. The public dimension of punitive damages is additive, not exclusive. See Howell v. Associated Hotels, Ltd., 40 Haw. 492, 499-500 (Haw. Terr. 1954) (recognizing compensatory effect of exemplary damages); Masaki v. Gen. Motors Corp., 71 Haw. 1, 8 n.2, 780 P.2d 566, 571 n.2 (1989) (identifying functions of punitive damages: preserving the peace, inducing private enforcement, compensating for uncompensable losses, and paying attorney fees).

As this case shows, punitive damages can serve private ends. The court told the jury to punish Philip Morris only for conduct that caused Ricapor-Hall's injuries. So did both sides. Her interest in the punitive award was hers alone.

Philip Morris also invokes Hawai'i's private attorney general doctrine. But it's a fee-shifting rule for plaintiffs who vindicate important public rights. See In re Water Use

41

Permit Applications, 96 Hawai'i 27, 29, 25 P.3d 802, 804 (2001). Ricapor-Hall did not seek attorney fees. She did not vindicate a public right. She sought damages for her own injury. The doctrine doesn't fit.

Philip Morris urges us to follow Gault and Fabiano. Neither controls. Gault turned on a Georgia statute that limits products liability defendants to a single punitive damages award and diverts seventy-five percent to the state treasury. Brown & Williamson Tobacco Corp. v. Gault, 627 S.E.2d 549, 552 (Ga. 2006). Fabiano turned on a New York rule that confines punitive damages to conduct "affecting the public generally." Fabiano v. Philip Morris Inc., 862 N.Y.S.2d 487, 490 (N.Y. App. Div. 2008).

Hawai'i has neither rule.

Laramie and Williams read the MSA itself. Both went the other way. So do we.

Claim preclusion does not apply.

The circuit court called it correctly. Verdict stands.

## F.    The Circuit Court Erred in Reducing Ricapor-Hall's Award

Ricapor-Hall raises one issue. She says the circuit court was wrong to reduce her damages by her percentage of comparative negligence on the conspiracy claims. A plaintiff's negligence, she argues, does not reduce damages for an intentional tort.

Ricapor-Hall is right.

42

An intentional tort is a choice.  The tortfeasor intends the act and intends the injury.  Aloha Petroleum, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 155 Hawai'i 108, 120, 557 P.3d 837, 849 (2024).

Hawai'i law does not reward a defendant for targeting the careless over the careful.  As this court colorfully stated more than a century ago, the law "is not designed to protect the vigilant alone, . . . but is intended as a protection to even the foolishly credulous as against the machinations of the designedly wicked."  Cummins v. Cummins, 24 Haw. 116, 119 (Haw. Terr. 1917).

We affirm that principle.  A plaintiff's negligence does not reduce damages for an intentional tort.  One who deliberately inflicts harm may not benefit from their victim's negligence.

**1.  HRS § 663-31 Applies Only to Negligence Claims**

Before HRS § 663-31, all negligence claims were subject to the common law doctrine of contributory negligence.  Ozaki v. Ass'n of Apartment Owners of Discovery Bay (Ozaki II), 87 Hawai'i 265, 269, 954 P.2d 644, 648 (1998).  The old regime was all-or-nothing.  A plaintiff's negligence completely barred recovery. Id.

The Legislature softened the doctrine in 1969.  Wong v. Hawaiian Scenic Tours, Ltd., 64 Haw. 401, 405, 642 P.2d 930, 933

43

(1982) (per curiam) ("The legislative modification of the doctrine of contributory negligence . . . sought to temper a phase of the common law deemed inconsistent with contemporary notions of fairness."). HRS § 663-31 only bars recovery when a plaintiff's negligence is "greater" than the negligence of all defendants. HRS § 663-31. Otherwise, it reduces a negligent plaintiff's recovery based on their "proportion" of fault. Id.

Here, though, the statute does not apply to the intentional tort claims against Philip Morris. "Statutory interpretation starts with the statute's words." Alpha, Inc. v. Bd. of Water Supply, 154 Hawai'i 486, 490, 555 P.3d 173, 177 (2024). By its terms, the statute governs only actions "for negligence." HRS § 663-31. In addition to a negligence claim, Ricapor-Hall also alleged the intentional torts of conspiracy to commit fraudulent concealment and conspiracy to commit fraudulent misrepresentation. See 16 Am. Jur. 2d Conspiracy § 53 ("civil conspiracy is an intentional tort").

In the Special Verdict form, the jury found general damages of $6 million. There is no assignment of damages to specific claims and no way to apply HRS § 663-31 only to the negligence claim. So HRS § 663-31 does not control.

2. **Pure Comparative Negligence Does Not Apply Per Cummins**

That leaves the common law. The circuit court reduced Ricapor-Hall's damages by forty-six percent based on her

44

negligence.  It should not have.

Cummins forecloses it.  In fraud cases, reducing damages by the victim's negligence clashes with more than a century of Hawai'i law.

Long ago, this court held that "a person guilty of fraudulent misrepresentation cannot escape the effects of his fault on the ground of the injured party's negligence." Cummins, 24 Haw. at 120-21.  That principle was "well settled" even then.  Id. at 122.  The court explained:

> [W]here it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care.

Id.  Put simply, a "party guilty of fraud can take no benefit" from the victim's carelessness.  Id.

Cummins' rule is rooted in policy.  The law would rather "encourage negligence in the foolish" than "fraud in the deceitful."  Id. at 119.  What the defendant did matters more than what the plaintiff failed to do.

Comparative negligence principles have evolved in other areas of the law, but Cummins' prohibition remains.  Compare Hao, 69 Haw. at 236, 738 P.2d at 418-19 (applying pure comparative negligence to strict products liability claims), with Matsuura v. E.I. du Pont de Nemours & Co., 102 Hawai'i 149,

45

163, 73 P.3d 687, 701 (2003) (citing Cummins' rule).

Cummins forbids reducing damages for fraudulent conduct based on the victim's negligence. The circuit court did just that.

The jury found Philip Morris liable on conspiracy to commit fraudulent misrepresentation. That finding required proof of an intentionally false or misleading representation, intent to induce Ricapor-Hall's reliance, and Ricapor-Hall's reliance on the false representation to her detriment.

The jury awarded Ricapor-Hall general damages for this deliberate, fraudulent misconduct. The circuit court cut that award by forty-six percent based on her negligence.

The result violates Cummins. Philip Morris engaged in "fraudulent conduct" that misled Ricapor-Hall to her detriment. Yet the circuit court let it "escape the effects of [its] fault on the ground of [Ricapor-Hall's] negligence" when it slashed damages by forty-six percent. Cummins, 24 Haw. at 121-22.

The jury's negligence finding does not change the result. Where a plaintiff prevails on both negligence and intentional-tort theories covering the same injury, with damages not specified for each claim, the intentional-tort verdict shields the full award from comparative reduction. Otherwise the extra win on negligence would penalize the plaintiff, not the defendant.

Philip Morris' $2,760,000 windfall makes the error unmistakable. The court let a fraudulent actor profit from its victim's failure to "exercise[] reasonable diligence and care." Id. at 122.

Philip Morris seeks to confine Cummins to complete bars. It offers two versions of the same argument. First, that Cummins' language of "escape" reaches only outright avoidance of liability, not reductions in damages. Second, that because Cummins was decided when contributory negligence was itself an all-or-nothing defense, its rule likewise addresses only complete bars, not partial reductions.

Both readings shrink Cummins. The court did not speak of liability alone. It spoke of "the effects" of a defendant's wrongdoing. Id. at 121. And it forbade parties "guilty of an intentional and deliberate fraud" from "escap[ing] the legal consequences of [their] fraudulent conduct," based on an injured party's negligence. Id. at 121-22 (emphasis added).

Legal consequences include damages. See Kanahele v. Han, 125 Hawai'i 446, 457-58, 263 P.3d 726, 737-38 (2011) (damages awarded as a "consequence of" the violation of a legal right); see also Damages, Black's Law Dictionary 488 (12th ed. 2024).

Reducing Ricapor-Hall's damages let Philip Morris escape legal consequences "on the ground of the injured party's negligence." Cummins, 24 Haw. at 121. That the escape is

47

partial, rather than total, does not save it.  And that <u>Cummins</u> arose in a contributory negligence world does not confine its principle to that world.

    <u>Cummins</u> does more than announce a rule.  It explains why the rule reaches damages reductions too.  "[T]he party guilty of fraud can take <u>no benefit</u>" from their victim's failure to "exercise[] reasonable diligence and care."  <u>Cummins</u>, 24 Haw. at 122 (emphasis added).  Paying less in damages is a benefit. Comparative negligence does not apply.

    Other courts agree.  They treat contributory negligence's inapplicability to intentional torts as the reason a plaintiff's negligence cannot reduce intentional-tort damages.  <u>See, e.g.</u>, <u>McLain v. Training & Dev. Corp.</u>, 572 A.2d 494, 497 (Me. 1990) (quoting <u>Prosser & Keeton on the Law of Torts</u> § 67, at 477–78 (5th ed. 1984)) ("[C]ontributory negligence never has been considered a good defense to an intentional tort such as a battery, and it would likewise appear contrary to sound policy to reduce a plaintiff's damages under comparative fault for his 'negligence' in encountering the defendant's deliberately inflicted harm."); <u>Heiner v. Kmart Corp.</u>, 100 Cal. Rptr. 2d 854, 865 (Cal. Ct. App. 2000) (same); <u>R.J. Reynolds Tobacco Co. v. Gerald</u>, 76 V.I. 656, 731 n.47 (V.I. 2022) (collecting cases). American Law Reports explains why:

> The clearly prevailing view is that comparative negligence
> principles are not applicable to intentional torts . . . .

48

> The rationale for this view rests on the general assumption that comparative negligence evolved to provide compensation to tort victims, who were barred by the harsh doctrine of contributory negligence, and should not be used to diminish recovery where the common law had previously treated an intentional tort victim's contributory fault as irrelevant to damage recovery where an intentional tort was inflicted.

A.L. Schwartz, Applicability of Comparative Negligence Principles to Intentional Torts, 18 A.L.R. 5th 525, § 2[a] (1994).

Cummins' rejection of contributory negligence for intentional torts bars comparative negligence as well.

Comparative negligence's original purpose reinforces this conclusion. It "was designed 'to mitigate the unjust hardships that the contributory negligence doctrine imposes on accident victims.'" Field v. Boyer Co., L.C., 952 P.2d 1078, 1084 (Utah 1998) (Stewart, J., concurring and dissenting) (quoting 4 Fowler V. Harper et al., The Law of Torts § 22.5, at 295 (2d ed. 1986)). It aimed "to provide compensation to tort victims," not to reduce recovery. Schwartz, supra § 2[a].

Hawai'i's own statute reflects this understanding. The legislature abrogated contributory negligence because it deemed the doctrine "unfair." See Rapoza v. Parnell, 83 Hawai'i 78, 82, 924 P.2d 572, 576 (App. 1996). And it intended HRS § 663-31 to "allow" negligent plaintiffs "to be recompensed" where they previously could not. Hawaiian Scenic Tours, Ltd., 64 Haw. at 405, 642 P.2d at 933.

These legislative aims do not license damages reductions where the plaintiff's negligence did not previously limit recovery.

Cummins itself was a fraud case. Philip Morris' intentional torts involved fraudulent conduct. It was "well settled" in 1917 that "a party guilty of fraudulent conduct shall not be allowed to cry 'negligence,' as against his own deliberate fraud." Cummins, 24 Haw. at 122. It still is. The rule reaches reductions, not just outright prohibitions.

Here, the jury found Philip Morris liable for negligence, strict products liability, and conspiracy to commit fraud. It found Ricapor-Hall sustained $6 million in general damages. But the Special Verdict form did not ask the jury to assign damages to each claim. In these circumstances, the circuit court erred in reducing Ricapor-Hall's damages based on her negligence.

When a defendant commits an intentional tort, the plaintiff's negligence does not reduce damages. This tracks "the traditional common law rule that contributory negligence does not bar or result in apportionment of damages in an intentional tort claim." Gerald, 76 V.I. at 733.

The rule is not confined to fraud. Cummins arose from fraud, but its principle pivots on intent. 24 Haw. at 122. Intent binds every intentional tort. See Restatement (Third) of Torts: Apportionment of Liab. § 12 cmt. b (Am. L. Inst. 2000).

Fraud, battery, conversion, intentional infliction of emotional distress – the rule reaches them all.

This holding overrules Ozaki I.  See Ozaki v. Ass'n of Apartment Owners of Discovery Bay (Ozaki I), 87 Hawai'i 273, 954 P.2d 652 (App. 1998).  That case was a domestic violence murder. A tenant was strangled by her estranged boyfriend in her own apartment.  The jury assigned her five percent of the fault. Ozaki I let that five percent reduce her estate's recovery from her killer.  Id. at 282-83, 954 P.2d at 661-62.  That is what Cummins forbids.

### 3. Hawai'i's Strict Products Liability Cases Are Distinguishable

This court's embrace of pure comparative negligence elsewhere does not justify adopting it here.

Kaneko, Armstrong, and Hao applied pure comparative negligence to strict products liability claims.  See Kaneko v. Hilo Coast Processing, 65 Haw. 447, 463, 654 P.2d 343, 353 (1982); Armstrong v. Cione, 69 Haw. 176, 180-83, 738 P.2d 79, 82-83 (1987); Hao, 69 Haw. at 236, 738 P.2d at 418-19 (together, Kaneko line).  Thus, a plaintiff's negligence "reduces but does not defeat" their strict products liability claim, even when the plaintiff's fault is greater than that of the defendants.  Hao, 69 Haw. at 236, 738 P.2d at 419.

51

Philip Morris argues that applying pure comparative negligence to intentional tort claims "flows naturally" from the Kaneko line.

It doesn't.

That caselaw is specific to strict products liability and does not extend to intentional torts. The policy, doctrine, and equities all cut the other way.

### a. Policy Aims

The Kaneko line's underlying policy interests do not translate to the intentional-tort context.

When this court applied comparative negligence to strict products liability claims, it did not consider whether the rule extends to intentional torts, or how deliberate conduct alters the calculation. Rather, the court "fashion[ed] a rule of comparative negligence to suit [its] original purposes in adopting strict products liability." Armstrong, 69 Haw. at 180, 738 P.2d at 82. Those purposes include protecting consumers, holding manufacturers and distributors accountable for placing dangerous goods in the market, and creating economic incentives for safer products. Id. at 182, 738 P.2d at 82-83.

Though vital to strict products liability, these aims are irrelevant to intentional torts. Cf. Ozaki II, 87 Hawai'i at 271, 954 P.2d at 650 (recognizing that "[t]he public policy underlying the decision" to apply pure comparative negligence to

52

strict products liability claims "simply has no bearing" on a negligence claim).

b.     **Doctrinal Justifications**

Two doctrinal aspects of strict products liability justify applying comparative negligence there.  Neither justifies it here.

First, strict products liability imposes liability regardless of fault.  That calls for guardrails.  See Kaneko, 65 Haw. at 463, 654 P.2d at 353.

Hawai'i imposes strict liability on manufacturers of dangerous, defective products regardless of fault.  The point is to shift "the burden of accidental injuries caused by defective chattels" to those best positioned to prevent them.  Id. at 452, 654 P.2d at 347; Armstrong, 69 Haw. at 182, 738 P.2d at 82 (quoting Stewart v. Budget Rent-A-Car Corp., 52 Haw. 71, 75, 470 P.2d 240, 243 (1970)).

But strict products liability "was never intended to be 'absolute liability.'"  Kaneko, 65 Haw. at 463, 654 P.2d at 353 (quoting Daly v. Gen. Motors Corp., 575 P.2d 1162, 1166 (Cal. 1978)).

Manufacturers are not "insurers of the safety of the product's user."  Id.  Accounting for a plaintiff's negligence keeps the doctrine tethered to "accidental injuries" and

"defective chattels." Armstrong, 69 Haw. at 182, 738 P.2d at 82.

Intentional torts need no such guardrails. They pose no risk of drifting into absolute liability because every intentional tort has intent built into its elements. See Restatement (Third) of Torts: Apportionment of Liab. § 12 cmt. b ("intent is an element in all intentional torts"). Intent is the limit.

Second, a plaintiff's assumption of risk historically barred recovery in strict products liability, even though a plaintiff's negligence would only reduce damages in a negligence action. See Kaneko, 65 Haw. at 463, 654 P.2d at 353-54.

Kaneko called this an "anomaly" that rewarded skillful pleading and produced "an imbalance" between the two theories. Id. Comparative negligence cured it, replacing the all-or-nothing bar with proportional reduction. Id.

No such anomaly exists for intentional torts. A plaintiff's negligence does not bar recovery for an intentional tort. See Restatement (Second) of Torts § 481 (1965).

There is no all-or-nothing bar to soften, so the justification for importing comparative negligence falls away. See, e.g., Flood v. Southland Corp., 616 N.E.2d 1068, 1071-72 (Mass. 1993); Burke v. 12 Rothschild's Liquor Mart, Inc., 593 N.E.2d 522, 531 (Ill. 1992).

Both doctrinal features support comparative negligence for strict liability.  Neither reaches intentional torts.

### c.    Fairness and Equity

Fairness and equity concerns widen the gap.  In strict products liability actions, fairness supports comparative negligence.  In intentional torts it does the opposite.

Kaneko rejected the objection that strict liability and comparative negligence "are incapable of being reconciled" because strict liability is "not based upon negligence."  65 Haw. at 460, 654 P.2d at 351.

The court acknowledged the "conceptual and semantic problems," but held the doctrines "not incompatible."  Id. at 460-61, 654 P.2d at 352.  Because strict products liability "was premised on equity and fairness," reducing a negligent plaintiff's recovery "accomplish[es] a fairer and more equitable result."  Id. at 461, 654 P.2d at 352.

"[F]airness and equity are more important than semantic consistency."  Id.  So it is with intentional torts.  But here, those values compel the opposite outcome.  They forbid reducing damages.

Intentional tortfeasors are the worst kind.  They intend to cause injury.  Aloha Petroleum, Ltd., 155 Hawai'i at 120, 557 P.3d at 849.

The law treats them differently than the merely negligent. See Cummins, 24 Haw. 116;  see also Restatement (Third) of Torts: Apportionment of Liability § 1 (2000), Reporters' Note, cmt. b ("When a defendant intentionally invades a plaintiff's rights, it makes sense to have different defenses, different rules about damages, and so forth, than when a defendant is merely negligent or, in strict liability, is innocent.") (emphasis added).

Most courts do not apportion intentional-tort damages based on a plaintiff's negligence.  Id. § 1, cmt. c.

The usual reason is conceptual.  Intentional misconduct and negligence are "not comparable."  See, e.g., Florenzano v. Olson, 387 N.W.2d 168, 176 n.7 (Minn. 1986) ("The difference between the victim's actions and the defendant's action is not one of degree, but of kind, and they are therefore not comparable.").

The conceptual argument is persuasive.  Intentional conduct involves a deliberate choice to act wrongfully.  Negligence, by contrast, is a failure to exercise reasonable care.  The two differ in kind.  Comparisons are fraught.

But policy drives the rule too.  See Field, 952 P.2d at 1083 (Stewart, J., concurring and dissenting) ("Intentional wrongdoing is so much graver a wrong than negligence . . . that the . . . need both to deter and to punish it outweighs any

social benefits that are thought to accrue from the rule of contributory negligence.").

The fairness stakes are high.  Using a plaintiff's negligence to reduce damages for intentional torts produces absurd results.  Id.

Consider a con artist who defrauds an elderly investor. She could shave damages by arguing that the victim negligently failed to check her references.  Or a thief who takes a car left running outside a coffee shop after the owner stepped inside for a minute.  He could reduce exposure by arguing that the owner should not have left the keys in the ignition.  These outcomes are intolerable under Hawai'i law.

The incentives are also twisted.  Reducing intentional-tort damages by a plaintiff's negligence entices defendants to target careless victims.  They can cut the price of their misconduct by showing their mark acted without due care.

We decline to create such a reward.  Cf. Florenzano, 387 N.W.2d at 176 n.7 ("We . . . consider it bad policy to permit an intentional tortfeasor the defense of comparative negligence merely because he or she chooses a gullible or foolish victim.").

Comparative negligence would not "accomplish a fairer and more equitable result" in intentional-tort actions.  Kaneko, 65 Haw. at 461, 654 P.2d at 352.  Far from it.  Reducing

intentional-tort damages by the victim's negligence "turns both morality and the law on their heads." Field, 952 P.2d at 1083 (Stewart, J., concurring and dissenting).

### 4. Other Courts Agree

Ricapor-Hall's negligence does not reduce her damages for intentional torts. Other jurisdictions are divided. Gerald and Schoeff agree with us. Blazovic does not. See Gerald, 76 V.I. 656; Schoeff v. R.J. Reynolds Tobacco Co., 232 So.3d 294 (Fla. 2017); Blazovic v. Andrich, 590 A.2d 222 (N.J. 1991).

In Gerald, the Virgin Islands Supreme Court held as we do: a plaintiff's comparative negligence cannot reduce intentional-tort damages. 76 V.I. at 733-34. The case is a close analogue. Like Ricapor-Hall, Gerald prevailed on both negligence and intentional-tort claims, and was assigned a percentage of fault. Id. at 730 n.45-46.

The defendant argued the trial court should have reduced damages by that fault. Id. at 730.

The Virgin Islands Supreme Court disagreed. Id. at 734. Like Hawai'i, the Virgin Islands had enacted a comparative negligence statute to abolish the contributory-negligence bar. Id. at 730. And like HRS § 663-31, that statute "only applies to actions based on 'negligence,'" so "it cannot be read as applying to intentional conduct." Id. at 732.

58

The legislature "could have chosen to apply comparative fault to intentional torts as well, but it chose not to." Id. at 733.

Because legislatures are presumed to know the common law and statutes in derogation of it are strictly construed, Gerald read the comparative negligence statute narrowly. Id. at 733. It "only overruled" the contributory-negligence bar. Id. It "did not overrule the traditional common law rule that contributory negligence does not bar or result in apportionment of damages in an intentional tort claim." Id.

Gerald's analysis tracks ours.

In Hawai'i, abrogation of the common law is disfavored. HRS § 1-1 makes common law principles applicable "except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State." HRS § 1-1 (2009). And this court is "unwilling[] to impliedly reject its principles[] . . . absent a finding of 'express [legislative] intent.'" Gold Coast Neighborhood Ass'n v. State, 140 Hawai'i 437, 452, 403 P.3d 214, 229 (2017).

The Hawai'i Legislature imposed a modified comparative negligence scheme on negligence actions. See HRS § 663-31; Ozaki II, 87 Hawai'i at 270, 954 P.2d at 649. But it did not alter the common law's treatment of intentional torts.

Like the Virgin Islands, Hawai'i "could have chosen to apply comparative fault to intentional torts."  Gerald, 76 V.I. at 733.  It did not.  And its silence does not abrogate the common law.  The intentional-tort rule survives.

Gerald does not stand alone.  The Florida Supreme Court reached the same conclusion in Schoeff, holding it error to reduce a smoker's intentional-tort damages by their comparative fault.  232 So.3d at 305.

Florida's comparative fault statute, like HRS § 663-31, reaches only negligence.  Id. at 301.  And the court applied the same canon we do: a statute is read narrowly against displacing the common law, under which "intentional torts are not reduced by comparative fault."  Id. at 304; see Burns Int'l Sec. Servs., Inc. v. Dep't of Transp., 66 Haw. 607, 611, 671 P.2d 446, 449 (1983).

True, Florida's exemption is express and HRS § 663-31's is not.  But we have read HRS § 663-31's plain language to apply only to negligence claims.  Ozaki II, 87 Hawai'i at 270, 954 P.2d at 649 (where negligence was one of several theories against the same defendant, HRS § 663-31 "applied only to the plaintiffs' contributory negligence and did not operate as a complete bar to recovery with respect to other asserted theories of liability").  The limited reach is clear either way.  Where the legislature

left the common law intact, we follow the common law.  See Burns Int'l, 66 Haw. at 611, 671 P.2d at 449.

Blazovic went the other way.  It applied comparative fault to intentional torts.  Blazovic, 590 A.2d at 231.  But it turned on a materially different statute, and its facts do not match ours.  These differences make Blazovic a poor fit.

Blazovic involved a late-night brawl outside a bar.  Id. at 224.  The plaintiff sued the bar for negligence and four men for assault and battery.  Id.  The jury found the bar and the plaintiff negligent and the four men liable for intentional assault.  But the trial court let the jury apportion fault only between the two negligent parties.  Id.  The New Jersey Supreme Court reversed.  Fault must be apportioned to the intentional tortfeasors, it held, and a plaintiff's comparative fault reduces recovery.  Id. at 231, 233-34.

Two features make Blazovic unpersuasive here.  First, New Jersey's statute is "not limited to negligence actions" and "was intended to cover fault in a broader sense rather than in the narrow negligence concept."  Id. at 226-27.  HRS § 663-31 is the opposite.  It is confined to actions "for negligence."  See Ozaki II, 87 Hawai'i at 269-70, 954 P.2d at 648-49.  Blazovic's result followed its broad statute; ours follows our narrow one. Second, Blazovic's concern was apportioning fault "in a multi-

61

party case." 590 A.2d at 227. This is not one. Philip Morris was the only defendant at trial.

Blazovic is therefore not compelling. Gerald and Schoeff are the better analogues.

**G.    Philip Morris' New Trial Arguments Fail**

The circuit court erred in reducing Ricapor-Hall's damages. Philip Morris argues the remedy should be a new trial on damages. It speculates that the jury might have awarded less if the circuit court had not instructed it on comparative negligence. But the court's other instructions guarded against that result. The court told the jury to "determine the total amount of [Ricapor-Hall's] damages, without regard to whether [Ricapor-Hall's] own negligence was also a legal cause of her injuries." (Emphasis added.) Again, we presume the jury followed that instruction. Myers, 76 Hawai'i at 165, 871 P.2d at 1235.

Philip Morris' second argument fares no better. It says a new trial is warranted because the circuit court declined its proposed instruction on mitigation of damages. It isn't.

The duty to mitigate is a doctrine of "avoidable consequences." Montalvo, 77 Hawai'i at 287, 884 P.2d at 350. It is not about preventing the injury. It concerns the plaintiff's obligation to make reasonable efforts to "alleviate the effects of the injury." *Mitigation of Damages Doctrine*, Black's Law

Dictionary 1198 (12th ed. 2024); see Gibo v. City & Cnty. of Honolulu, 51 Haw. 299, 305, 459 P.2d 198, 202 (1969) (plaintiff has "duty to use reasonable care to effect a cure and to avoid aggravation of injuries").  A plaintiff must be "aware of" the injury before any duty to mitigate arises.  Restatement (Third) of Torts: Remedies § 8 (Am. L. Inst., Tentative Draft No. 1, 2022).

Philip Morris misses this temporal distinction.

It argued below that Ricapor-Hall's smoking "before 2019" "justified the giving of the mitigation instruction."  It didn't.  Ricapor-Hall only sought damages for her lung cancer, and doctors did not detect that cancer until 2019.  Her duty to mitigate could not begin until she learned of her condition.

To receive the instruction, Philip Morris had to show that Ricapor-Hall failed to take reasonable steps to mitigate after her diagnosis.  See Malani v. Clapp, 56 Haw. 507, 517, 542 P.2d 1265, 1271 (1975).  It made no such showing.

A new trial is not warranted under either ground.

## IV.

We vacate the portion of the final judgment reducing Ricapor-Hall's damages by forty-six percent.  We remand for entry of an amended judgment awarding Ricapor-Hall the full $6,000,000 in general damages, subject to whatever settlement

credits the circuit court determines are appropriate.  In all
other respects, we affirm.


Scott A. Chesin and                    /s/ Vladimir P. Devens
David M. Louie
(Nicholas R. Monlux, Ryan D.           /s/ Sabrina S. McKenna
Louie, Annie Y.S. Chuang,
Nalani L. Crisologo, and               /s/ Todd W. Eddins
Kenneth J. Reilly on the briefs)
for appellant/cross-appellee           /s/ Lisa M. Ginoza



David J. Sales and                     /s/ Jordon J. Kimura
Alejandro Alvarez
(Wayne Parsons, Sergio Rufo,
William F. Brown, and
Nicholas Reyes, on the briefs)
for appellee/cross-appellant